UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Paul D. Robinson,                )<br>                                         )<br>                    Plaintiff,       )<br>                                         )<br>vs.                                     )<br>                                         )<br>Officer A. Brown,                )<br>                                         )<br>                    Defendant.   )<br>_____) | Civil Action No. 4:15-cv-00387-RBH-KDW<br><br>REPORT AND RECOMMENDATION |

Plaintiff filed this 42 U.S.C. § 1983 action alleging that Defendant violated his constitutional rights by shooting him in the leg while attempting to apprehend him. This matter is before the court on Defendant's Motion for Summary Judgment, ECF No. 74, filed on December 22, 2015. On January 13, 2016, Plaintiff filed a Response in Opposition to Defendant's Motion, ECF No. 84, and Defendant filed a Reply on January 25, 2016, ECF No. 85. Therefore, this matter is now ripe for review. This case was referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. Because this Motion is dispositive, a Report and Recommendation is entered for the court's review.

   I.     Background

Plaintiff is currently confined in the Florence County Detention Center. ECF No. 1 at 2. This lawsuit arises from a police chase that occurred on April 28, 2014, and ended with a police officer shooting himself and Plaintiff. *Id.* at 3. Plaintiff represents that on the day of the pursuit he was driving a vehicle that had been reported stolen, and he failed to stop for police because he had marijuana and illegal prescription pills in his possession. *Id.* Plaintiff maintains that he tried to roll down his windows and throw out the drugs, but Officer Jon Watts rammed his police car

into the back of the car Plaintiff was driving. *Id.* Plaintiff admits the car he was driving was stolen because it belonged to his girlfriend and "[they] got into a bad argument, which led [Plaintiff] to taking her car." *Id.*

Plaintiff alleges that he "knew Florence County Sheriff['s] Department was out for blood so [he] had to get in front of some people or witnesses . . . [so he] continued flight and then failed to stop near the scene of that collision." *Id.* Plaintiff maintains that he "got the opportunity [to] hop out of the vehicle an[d] fled the scene on foot, thinking [he] was running towards witnesses but instead [he] ran into a fence." *Id.* Once officers caught up with him, Plaintiff alleges that he was "on his stomach, hands behind [his] head, assuming the position," and an officer kicked him in the face twice and then shot him in his upper thigh with a Glock 40 caliber bullet that "went through [his] leg, an[d] graze[d] [his] penis." *Id.* at 4. Plaintiff maintains that once he was apprehended, police searched his pockets and found drugs. *Id.* Then, Plaintiff represents he was placed on a gurney and transported to McLeod Hospital in Florence County. *Id.* After a two-day stay in the hospital Plaintiff represents that he was released to the Florence County Detention Center where he has been treated unfairly, maced, and tased. *Id.*

Plaintiff brings suit for use of excessive force during seizure or a deprivation of his Eighth and Fourteenth Amendment rights for the discharge of the officer's firearm. ECF No. 1-2 at 2. Specifically, Plaintiff alleges that the officer shot him for no reason or no justifiable reason and acted with deliberate indifference or callous indifference by purposefully inflicting excessive force against Plaintiff. *Id.* Plaintiff seeks redress, compensatory damages, and punitive damages. *Id.* at 3. Additionally, he calls for the termination of certain police officers and asks that he be released from incarceration. *Id.*

2

Since filing his initial Complaint, Plaintiff has filed four Motions to Amend his Complaint. *See* ECF Nos. 23, 42, 57, 62. In his Motions, Plaintiff adds and dismisses Defendants. *See id.* Defendant Officer A. Brown was added as a Defendant to this action on September 2, 2015, ECF No. 51, and Defendants Jon Watts and John Mims were dismissed as parties on October 7, 2015. ECF No. 58. Therefore, Defendant A. Brown is the only remaining party to this action, and the only moving party in this motion.

II.     Standard of Review

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. *Id.* at 324. Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue. *Id.* Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 251. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion. *Ross v.*

*Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228 (1989).

 III. Analysis

  A. Excessive Force Claim

 Defendant argues that his accidental discharge of his weapon did not violate the Fourth Amendment. ECF No. 74-1 at 6. Further, Defendant maintains that the only evidence in the record is that the discharge was entirely accidental and cites to cases where courts have held that accidental shootings do not amount to Fourth Amendment violations. *Id.* at 7-9. In his Response, Plaintiff recites many of the allegations contained in his Complaint and argues that Defendant is a "highly trained officer of the law" and is trained to avoid accidents. ECF No. 84 at 5. In his Reply, Defendant argues the video footage submitted to the court demonstrates that Plaintiff was actively evading arrest and clearly contradicts Plaintiff's version of the facts. ECF No. 85 at 1-2. In response to Plaintiff's argument that Defendant's discharge of the gun was not accidental, Defendant points to his affidavit and the Incident Reports prepared after Plaintiff's apprehension. *Id.* at 2-3.

 Defendant and Plaintiff correctly assert that *Graham v. Connor*, 490 U.S. 386, 395 (1989) establishes that claims against law enforcement for excessive force in course of arrest, investigatory stop or other "seizure" of a person are properly analyzed under the Fourth Amendment's objective "reasonableness" standard. There, the Supreme Court recognized "that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. Further, the Court held that there is not a precise mechanical application of the standard, but "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of

4

the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Additionally, the Court instructs that an officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. *Id.* at 396-97. Therefore, guided by the authority in *Graham*, the undersigned must examine the totality of the circumstances and the uncontested facts, viewed in the light most favorable to the Plaintiff, to determine whether Defendant's use of force was reasonable.

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). But a "seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement. . . ." *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989). Instead, an individual is "seized" under the Fourth Amendment "only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Id.* at 597 (emphasis in original); *see also Watson v. Bryant*, 532 F. App'x 453, 457 (5th Cir. 2013) ("The Supreme Court and this circuit have long held that Fourth Amendment violations occur only through intentional conduct."); *Brown v. City of Charleston*, No. 2:12-CV-01865-DCN, 2013 WL 4436398, at *4 (D.S.C. Aug. 15, 2013) ("[T]he court must still decide whether the officer's actions were willful rather than accidental.").

The undersigned has considered all evidence submitted by the parties. Here, Plaintiff argues that Defendant was a highly-trained officer, and therefore the discharge of his weapon could not have been accidental. However, without something more than his bald accusation, Plaintiff has not set forth sufficient evidence to create a genuine dispute over whether Defendant intentionally discharged his weapon. *See Brown v. City of Charleston*, No. 2:12-CV-01865-DCN, 2013 WL 4436398, at \*6. However, Defendant has submitted several pieces of evidence that demonstrate his weapon discharge was accidental.

Defendant submitted footage from four officers' vehicle dash-cameras from the day of the police chase. ECF No. 74-3 at 4; ECF No. 79 (DVD of dash camera videos from Officers Frye, Davis, Mims, and Jacobs). The undersigned has reviewed the video evidence and notes that the footage depicts the car chase, Plaintiff exiting the stolen car, and Plaintiff fleeing by foot. However, the footage does not depict what occurred once Plaintiff was in the wooded area near the crash scene. The footage from Officer Davis' vehicle depicts Plaintiff's vehicle swerving in front of Officer Davis' car and then cutting off the car. Plaintiff then jumps from the car and runs in the middle of four lanes of traffic away from Officers who are on the scene. Thereafter, officers arrest a man who was sitting inside Plaintiff's vehicle. The dash-camera from Officer Mims' vehicle demonstrates Officer Mims activating his blue lights. Upon activation, Plaintiff speeds up and does not stop for Officer Mims. A high-speed chase ensues. During the chase, Plaintiff weaves in between lanes and comes into contact with another police car while crossing an intersection. Finally, Plaintiff slows his vehicle, opens the driver's side door, but appears to change his mind about stopping, so he shuts the door and again speeds off. However, a traffic jam forces Plaintiff to stop the vehicle. The dash-camera footage then demonstrates Plaintiff running into the woods by the road in front of Officer Mims' vehicle. The dash-camera footage

from Officer Jacobs' vehicle depicts the officers' arrival at the scene where Plaintiff fled by foot. Officer Jacobs then exits his vehicle with his K-9 unit to go after Plaintiff.[1] From the audio, you can hear one of the officers say that an officer shot himself and Plaintiff.

Plaintiff included the Incident Reports from officers involved in his apprehension as exhibits to his Complaint. ECF No. 1-3. In Defendant's Incident Report, he provided the following statement:

> I pursued [Plaintiff] and as I reached the bushes where [Plaintiff] was I drew my duty weapon (.40 Cal Glock 27) due to the earlier transmission from central dispatch that the subjects would be armed. I crouched down to find my way through the bushes with my gun pointing down. As I made my way through the bushes I saw [Plaintiff] lying prone on his stomach as if he was trying to hide. I yelled to [Plaintiff] to put his hands behind his back and that he was under arrest. I was still trying to get through the vines and bushes and as I made it through, my arm got tangled and my gun accidentally fired striking me in the right leg. At the time I did not realize that I was hit or that I had fired a shot. I holstered my weapon and continued giving [Plaintiff] orders to put his hands behind his back and he finally complied. Another officer asked me who was shooting and I looked down and saw that I was bleeding. I then advised that it was my gun that had been fired and that I was hit by the bullet. I sustained a long gash down my right thigh and an entry wound and exit wound to my right calf. I was later informed that the suspect had been struck by the same bullet that struck me.

ECF No. 1-3 at 2.

Defendant also submitted an affidavit to the court where he indicated he chased Plaintiff by foot into the wooded area where Plaintiff ran. ECF No. 74-2 ¶ 9. Furthermore, Defendant attests that "[b]ecause of the earlier radio transmission from dispatch that [Plaintiff] should be considered armed and dangerous, as I entered the wooded area I drew my service pistol for my

---

[1] The undersigned notes that the footage from Officer Frye's dash-camera was inoperable upon review. Because none of the footage from the dash-cameras depict what occurred off the road where Plaintiff was ultimately apprehended, the undersigned did not require Defendant to resubmit corrected or operable footage with the court as that information would be cumulative and not helpful to this analysis.

protection. I thought it was possible that [Plaintiff] was in the woods waiting to shoot or ambush me." *Id.* at ¶ 10. Additionally, Defendant avers:

> There were several bushes and vines where [Plaintiff] entered the wooded area, and I crouched down to make my way through. I had my pistol in my right hand pointed down. As I was trying to make my way through the bushes, I saw [Plaintiff] lying face-down trying to hide. I told him to put his hands behind his back and that he was under arrest. When I went to holster my weapon, my arm got tangled in the vines and branches, and I accidentally discharged my weapon. Initially I did not realize that it was my weapon that had fired. Other officers caught up with us almost immediately afterwards, and asked me who had fired the shot. At that point I looked down and realized that I was bleeding, and realized that it was my pistol that had discharged. The bullet grazed my right thigh, entered my upper right calf, and exited my right calf few inches below that. The same bullet evidently struck [Plaintiff] in his thigh.

*Id.* ¶¶ 11, 12.

Incident Reports prepared by other officers involved in Plaintiff's apprehension corroborate Defendant's representations from his Incident Report and Affidavit. In an Incident Report prepared by Officer "J Watts," the officer provided the following statement:

> The driver exited the vehicle and fled on foot. I then gave chase on foot along with other Florence Police Department Officers. [Plaintiff] ran into the woodline west of the railroad tracks that run parallel to Barringer St. [Defendant] gave chase into the woodline at which time I lost sight of [Plaintiff] and [Defendant]. At that time, I heard a gunshot. Upon entering the woodline, I observed [Defendant] standing over [Plaintiff]. I observed that [Defendant] had a gunshot wound to his lower right leg and [Plaintiff] had a gunshot wound to his left leg. I then placed [Plaintiff] in handcuffs. [Defendant] advised that the gunshot occurred as he was attempting to reholster his weapon. EMS arrived on scene and transported [Plaintiff] and [Defendant] to McLeod Hospital.

ECF No. 1-3 at 5. In another Incident Report prepared by Officer "S Starling," the officer provided the following statement:

> As I neared the scene Officer Watts advised via radio that shots had been fired and one officer as well as [Plaintiff] had been hit. I arrived at the railroad crossing of National Cemetery and Barringer St and observed [Defendant] on the ground approximately 25 yards north of the roadway. I then observed [Plaintiff] was approximately 20 yards north of [Defendant] . . . I approached [Defendant] and observed his right pants leg was cut open and that he had two small holes in the

> right front of his calf. It appeared that a projectile entered the upper part of the right side of his calf and exited approximately 4-6 inches below that. I applied pressure to the wound to control the bleeding however the wound seemed mostly superficial. As EMS arrived and attended to [Defendant] I removed his duty firearm (Glock 27, Ser# DVG981) from his holster and placed it in a paper bag.

*Id.* at 7.

In another Incident Report, Officer "E Clark" provides the following statement:

> [Defendant] entered the brush just ahead of myself and SPO Watts. Once I was in the brush line I observed [Plaintiff] on the ground on his belly lying on his hands. [Defendant] advised [Plaintiff] to put his hands out. As [Plaintiff] put his hands out I heard a single shot fired. After I looked around I asked [Defendant] who fired. At this time I noticed that [Defendant] was attempting to holster his weapon. I then heard the suspect start shouting that the officer shot him. . . .I noticed blood on the suspects left thigh of his pants. Once we were out of the bushes I also noticed blood on [Defendant's] right leg.

*Id.* at 8.

After consideration of all the evidence, the undersigned finds that Defendant accidentally discharged his weapon, wounding both himself and Plaintiff. Therefore, based on the undersigned's finding that Defendant's firearm accidentally discharged, Plaintiff was not seized for purposes of the Fourth Amendment. Several courts, including several district courts within our circuit have determined that an accidental shooting does not amount to a seizure under the Fourth Amendment. *See e.g.*, *Guerra v. Montgomery Cty., Md.*, 118 F. App'x 673, 675 (4th Cir. 2004) ("The district court presumably believed that the shooting itself did not violate the Fourth Amendment because it was accidental."); *Glasco v. Ballard*, 768 F. Supp. 176, 180 (E.D. Va. 1991) ("[A] more appropriate understanding of the case law, as well as the history of the Fourth Amendment, suggests that a wholly accidental shooting is not a 'seizure' within the meaning of the Fourth Amendment."); *see also Hicks v. Leake*, 821 F. Supp. 419 (W.D. Va. 1992) (holding that because driver was not object of police chase, there was no "seizure" necessary to show violation of Fourth Amendment rights); *Rucker v. Harford Cty., Md.*, 946 F.2d 278, 282 (4th Cir.

1991) ("[W]e still would conclude that given the exigencies of the situation, his accidental shooting of Rucker would not have constituted the kind of 'oppressive' abuse of governmental power, *see Daniels,* 474 U.S. at 331, against which substantive due process gives protection.").

Moreover, the undersigned finds that the federal appellate courts that have addressed this issue have held that the Fourth Amendment was not violated when a suspect was accidentally shot. *See e.g., Watson v. Bryant*, 532 F. App'x 453, 457 (5th Cir. 2013) ("In the absence of evidence showing that Bryant intended to use deadly force, we must conclude that the negligent shooting here did not itself violate Watson's Fourth Amendment rights."); *McCoy v. City of Monticello*, 342 F.3d 842, 848 (8th Cir. 2003) (finding that though facts established a seizure occurred, the officer who accidentally shot a motorist acted objectively reasonable, entitling him to qualified immunity); *Pleasant v. Zamieski,* 895 F.2d 272, 276–77 (6th Cir. 1990) (accidental shooting did not violate the Fourth Amendment); *Leber v. Smith,* 773 F.2d 101, 104–05 (6th Cir. 1985) (holding that plaintiff's unreasonable-seizure claim failed as a matter of law in an accidental shooting case and, therefore, declining to reach qualified immunity); *Dodd v. City of Norwich*, 827 F.2d 1, 7 (2d Cir. 1987) (reversing its decision on rehearing and finding no Fourth Amendment violation or municipal negligence was responsible for "the inadvertent shooting of an already apprehended burglar during a struggle initiated by him in an attempt to disarm the arresting officer and after he had apparently surrendered [when] [t]he shooting was a pure accident").

The undersigned recommends that the district find that the Fourth Amendment was not implicated when Defendant's firearm accidentally discharged, as other courts in this district have found. Alternatively, should the court determine that a "seizure" occurred under the Fourth Amendment, the undersigned recommends that the court find that the Fourth Amendment was

not violated based on the reasonableness of Defendant's actions under the circumstances presented here.

  B. Qualified Immunity

Defendant asserts that he is entitled to qualified immunity on Plaintiff's claims. ECF No. 74-1 at 12. The Supreme Court in *Harlow v. Fitzgerald* established the standard that the court is to follow in determining whether a defendant is protected by this immunity. That decision held that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow*, 457 U.S. 800, 818 (1982).

When evaluating a qualified immunity defense, the court must determine (1) whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 230-33 (2009). The two prongs of the qualified immunity analysis may be addressed in whatever order is appropriate given the circumstances of the particular case. *Id.* at 236. In determining whether the right violated was clearly established, the court defines the right "in light of the specific context of the case, not as a broad general proposition." *Parrish v. Cleveland*, 372 F.3d 294, 301-03 (4th Cir. 2004). "If the right was not clearly established in the specific context of the case—that is, if it was not clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted—then the law affords immunity from suit." *Id.* (citations and internal quotation omitted).

The record before the court shows that Defendant performed the discretionary functions of his respective official duties in an objectively reasonable fashion. Defendant did not transgress any statutory or constitutional rights of Plaintiff that he was aware of in the exercise of his respective professional judgments. Thus, to the extent the district judge finds that a constitutional violation occurred, the undersigned recommends that Defendant be granted qualified immunity.

IV.     Conclusion and Recommendation

Based on the foregoing, it is recommended that Defendant's Motion for Summary Judgment, ECF No. 74, be granted and this case be dismissed based on the undersigned's recommendation that no Fourth Amendment violation occurred and alternativey, Defendant is entitled to qualified immunity.

IT IS SO RECOMMENDED.

February 19, 2016                                                Kaymani D. West
Florence, South Carolina                                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

12